UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

NORTH AMERICAN FOREIGN TRADING
CORP.,

            **Plaintiff,**

   - against -

MITSUI SUMITOMO INSURANCE USA,
INC., f/k/a MITSUI MARINE AND FIRE
INSURANCE COMPANY OF AMERICA and
MSI CLAIMS (USA), INC.,

            **Defendant.**

------------------------------------- X

**OPINION & ORDER**

**05 Civ. 4807 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

North American Foreign Trading Corp. ("NAFT") brings this action

against Mitsui Sumitomo Insurance USA, Inc., formerly known as Mitsui Marine

and Fire Insurance Company of America, and MSI Claims (USA), Inc.

(collectively, "Mitsui") for breach of a marine insurance policy issued by Mitsui to

NAFT. NAFT now moves for summary judgment, arguing that Mitsui is liable for

NAFT's loss of cordless telephones at a warehouse in Guangdong, China. Mitsui

cross-moves for summary judgment, arguing that *first,* the policy did not cover

NAFT's loss and *second*, that NAFT's claim is time-barred under the policy. For

-1-

the following reasons, NAFT's motion for summary judgment is granted in part

and denied in part and Mitsui's cross-motion is denied.

## II.   FACTS

The facts of the case are largely undisputed. NAFT is an importer of

consumer electronic goods manufactured in Asia. Mitsui issued a marine

insurance policy to NAFT covering shipments from Asia, effective March 1, 2001

(the "Policy").[1] The parties entered into an endorsement extending coverage under

the Policy to goods temporarily stored in certain warehouses (the "Warehouse

Endorsement"), including a facility owned by Cidmate Technology, Inc.

("Cidmate") in Guangdong Province, China (the "Cidmate Warehouse").[2]

Between March 2002 and March 2004, NAFT purchased newly

manufactured cordless telephones from Cidmate in China, and returned certain of

---

[1]      *See* Mitsui Marine and Fire Insurance Company of America Open
Cargo Policy No. OCMM 01000, Ex. 1 to Affidavit of Gregory Taylor of Roanake
Trade Services, Inc., insurance broker for NAFT, in Support of Plaintiff's Motion
for Summary Judgment ("Taylor Aff.").

[2]      *See* Special Warehouse Coverage Endorsement to Policy No. OCMM
01000, Ex. 1 to Taylor Aff; Endorsement 19 to Policy No. OCMM001000
("Endorsement 19"), Ex. 1 to Taylor Aff. (including Cidmate Warehouse as an
"Approved Warehouse – Foreign").

those telephones to Cidmate for refurbishment at the Cidmate Warehouse.[3] As of

March 2004, NAFT's inventory reports showed that $1,267,078 in cordless

telephones had been shipped to the Cidmate Warehouse but never returned to

NAFT.[4] On or about April 12, 2004, NAFT's inspection service in China reported

that it was unable to gain access to the Cidmate Warehouse.[5] NAFT hired the

Horizon Law Firm ("Horizon") to investigate the Cidmate Warehouse on April 14,

2005.[6] Horizon reported that its representatives made three visits to the Cidmate

Warehouse between April 15 and April 22, 2004, and found the warehouse empty

and abandoned.[7] Local authorities and residents "suggested" to Horizon that given

the volume of the missing merchandise, it must have been removed "between

---

[3]    *See* Affidavit of Robert Schweitzer, Vice-President, NAFT in Support
of Plaintiff's Motion for Summary Judgment ("Schweitzer Aff.") ¶ 5.

[4]    *See id.* ¶ 9; 6/10/04 Preliminary Claim Statement from Taylor to
Marvin J. Margolies, Vice-President and Marine Claims Manager of MSI Claims
(USA), Inc., Ex. 8 to Taylor Aff.

[5]    *See* Schweitzer Deposition Transcript ("Schweitzer Dep.") at 33, Ex.
A to Affidavit of Francis A. Montbach, Counsel to Mitsui, in Opposition to
Plaintiff's Motion for Summary Judgment ("Montbach Aff."); 4/12/04 E-mail
from Lisa Gao, SGS Inspection Service, to Unisonic Products Co. HK Ltd.,
NAFT's Agent, Ex. C to Montbach Aff. (describing closure of Cidmate
Warehouse as of April 12, 2004); Schweitzer Aff. ¶ 6.

[6]    *See* Schweitzer Dep. at 33-34; Schweitzer Aff. ¶ 6.

[7]    *See* 4/22/04 Letter from Li Jin, Horizon Law Firm, to NAFT
("Horizon Letter") at 1, Ex. 2 to Taylor Aff.

-3-

April 2, 2004 and April 11, 2004, probably by a series of well organized actions."[8]

NAFT submitted a claim under the Policy on May 3, 2004 for $1,250,000, the aggregate liability limit under the Policy.[9] Mitsui retained forensic accountants, Meaden & Moore, LLP, to verify "(a) whether the loss occurred; (b) the quantum of the loss; and (c) where the claimed loss occurred."[10] Mitsui also appointed a surveyor to investigate the Cidmate Warehouse.[11] Between May 2004 and April 2005, Mitsui and Meaden & Moore investigated the claim.[12] Meaden & Moore requested documents from NAFT, including warehouse receipts, bills of lading, invoices, trust receipts, inventory reports, other accounting records and correspondence, and narrative reports describing NAFT's business practices.[13] NAFT provided this information and made its records

---

[8]     *Id.* at 2.

[9]     *See* Schweitzer Aff. ¶ 7. NAFT notified its insurance broker of the disappearance of telephones on April 28, 2004, and NAFT's broker filed the claim on behalf of NAFT. *See id.*

[10]    Affidavit of Marvin J. Margolies in Opposition to Plaintiff's Motion for Summary Judgment ("Margolies Aff.") ¶ 11.

[11]    *See* 5/13/04 Fax from Xuan Yong of Huatai Insurance Agency & Consultant Service Ltd. to MSI Claims (USA), Inc., Ex. D to Ryan Aff.

[12]    *See* Taylor Aff. ¶ 7; Schweitzer Aff. ¶¶ 8-9; Margolies Aff. ¶ 11.

[13]    *See* Taylor Aff. ¶ 7; Schweitzer Aff. ¶¶ 8-9.

-4-

available to Meaden & Moore.[14]

In response to inquiries from NAFT regarding the status of the claim, Margolies wrote in November 2004 that "due to the nature of this claim, the amount involved, and the status of Meaden & Moore's review" Mitsui was "currently not in a position to respond affirmatively to your request."[15] Margolies informed NAFT that it would respond "as soon as we are in a position to . . . do so."[16] Mitsui asserts that it received a response to its last outstanding request for information related to the claim from NAFT's counsel on March 16, 2005.[17]

On March 31, 2005, Meaden & Moore forwarded their report to Mitsui, which stated that they had "found no material difference between the $1,267,078 claimed as goods returned to Cidmate . . . and the documentation supporting the actual shipment of these goods to Cidmate."[18] NAFT did not

---

[14]    *See* Taylor Aff. ¶ 7; Schweitzer Aff. ¶¶ 8-9; Margolies Aff. ¶ 11.

[15]    11/14/04 Letter from Margolies to Taylor ("Margolies Letter"), Ex. 15 to Taylor Aff.

[16]    *Id.*

[17]    *See* 3/16/05 Letter from John F. Ryan, Counsel to NAFT, to Montbach, Ex. B to Montbach Aff.

[18]    3/31/05 Letter from Meaden & Moore to Margolies at 4, Ex. 16 to Taylor Aff.

review Meaden & Moore's report at that time.[19] Under the Policy, Mitsui was required to make payment to NAFT "within thirty (30) days after proof of loss, proof of interest and adjustment."[20] On April 18, 2005, the parties entered into an agreement (the "Standstill Agreement") which provided that all rights of Mitsui and NAFT to file suit or proceed with litigation would "remain at status quo as of" April 18, 2005 "up to and including May 5, 2005."[21] The parties later agreed to extend the Standstill Agreement to May 19, 2005.[22]

In a letter dated May 2, 2005 (the "Declination Letter"), Mitsui denied coverage for NAFT's claim, stating that the "loss was not due to any insured peril" and quoting paragraphs 1, 7(a), 7(b), and 13 of the Warehouse Endorsement, and paragraph 25 of the Policy, pertaining to the scope of coverage for goods on shore.[23] Mitsui argues that the Policy only provided coverage for goods on shore with respect to certain named perils not including mysterious

---

[19]     *See* Taylor Aff. ¶ 9. In fact, NAFT did not review the report until after commencing this action. *See id.*

[20]     Policy ¶ 46.

[21]     4/18/05 Stand Still Agreement, Ex. B to Affidavit of John F. Ryan in Support of Plaintiff's Motion for Summary Judgment ("Ryan Aff.").

[22]     *See* 5/4/05 Letter from Ryan to Montbach, Ex. C to Ryan Aff.

[23]     5/10/05 Letter from Margolies to Taylor at 1-2, Ex. 17 to Taylor Aff.

-6-

disappearance. NAFT argues that under the Warehouse Endorsement, the Policy

covers all risks to goods on shore, including mysterious disappearance. NAFT

filed this action on May 18, 2005. Mitsui claims that the action is time-barred

because the Policy provides for a one-year limitations period in which to file suit.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[24] "An issue of fact is genuine 'if the evidence is

such that a jury could return a verdict for the nonmoving party.'"[25] A fact is

material when "it 'might affect the outcome of the suit under the governing

law.'"[26] The movant has the burden of demonstrating that no genuine issue of

material fact exists.[27]

In turn, to defeat a motion for summary judgment, the non-moving

[24]    Fed. R. Civ. P. 56(c).

[25]    *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)
(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[26]    *Id.* (quoting *Anderson*, 477 U.S. at 248).

[27]    *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d
241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157
(1970)).

-7-

party must raise a genuine issue of material fact. To do so, it must do more than

show that there is a "'metaphysical doubt as to the material facts,'"[28] and it "'may

not rely on conclusory allegations or unsubstantiated speculation.'"[29] In

determining whether a genuine issue of material fact exists, the court must

construe the evidence in the light most favorable to the non-moving party and

draw all justifiable inferences in that party's favor.[30]

## B. Scope of Coverage

A marine insurance policy typically provides coverage for "all risks"

or only for certain "named perils."[31] A policy may provide both all-risks and

named-perils coverage, depending on the type of shipment at issue.[32] To prove

---

[28]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[29]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express
Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[30]    *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir.
2004).

[31]    *See, e.g., Miller Marine Services, Inc. v. Travelers Property Cas. Ins.
Co.*, No. 04 Civ. 5679, 2005 WL 2334385, at *4 (E.D.N.Y. Sept. 23, 2005)
(applying New York law). Here, the parties assume that New York law controls
this dispute and their implied consent "is sufficient to establish choice of law."
*Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000).

[32]    *See Costabile v. Metropolitan Prop. & Cas. Ins. Co.*, 193 F. Supp. 2d
465, 477 (D. Conn. 2002) (property insurance policy was all-risk policy with
respect to coverage for dwelling and private structures and named-perils policy

-8-

that a named-perils policy covers its claim, the insured has the burden of demonstrating that its loss was caused by a covered occurrence.[33] To prove that an all-risk policy covers its claim, the insured has the burden of demonstrating "(1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property."[34] "The insured, however, need not prove the cause of the loss."[35] Absent "an exclusion for mysterious disappearance, 'all risk' policies cover the 'mysterious disappearance' or 'fortuitous loss' of the goods insured."[36] Under an all-risk policy, the insurer has the burden of "putting forward evidence establishing that an exception to coverage applies."[37]

## C.    Time Bar

---

with respect to personal property coverage).

[33]    *See Northwestern Mutual Life Ins. Co. v. Linard*, 498 F.2d 556, 561 (2d Cir. 1974).

[34]    *International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). These requirements are derived from "controlling federal and New York law." *Id.*

[35]    *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 77 (2d Cir. 1996) (citations omitted).

[36]    *Id.*

[37]    *Id.*

Under New York law, parties to a contract may designate a

reasonable period of limitations within which a claim arising out of the contract is

to be commenced, even if that period is shorter than the statutory period.[38] New

York courts have held that a one-year time limitation to bring suit for breach of an

insurance contract is reasonable and enforceable.[39] The defendant has the initial

burden of establishing that the limitations period in the policy expired prior to the

commencement of the action.[40]

Once the defendant has met its burden, the plaintiff has the burden "to

aver evidentiary facts establishing that the case at hand falls within an exception to

the limitations period," such as waiver or estoppel.[41] In order to establish waiver,

"plaintiff must present evidence from which the defendant's intent to relinquish

the protection of the contractual limitations period can be reasonably inferred."[42]

---

[38]     *See* N.Y. Civ. Prac. L. & R. § 201.

[39]     *See, e.g., Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 967 (1988).

[40]     *See Neary v. Nationwide Mut. Fire Ins. Co.*, 791 N.Y.S.2d 840 (2d Dep't 2005) (citing *Minichello v. Northern Assurance Co. of Am.*, 758 N.Y.S.2d 669, 670-71 (2d Dep't 2003)).

[41]     *Id.* (citing *Minichello*, 758 N.Y.S.2d at 670-71).

[42]     *Enterprise Eng'g, Inc. v. Hartford Fire Ins. Co.*, No. 04 Civ. 5018, 2004 WL 2997857, at *3 (S.D.N.Y. Dec. 23, 2004). *Accord Gilbert Frank Corp.*, 70 N.Y.2d at 968.

-10-

Waiver "should not be lightly presumed."[43] To establish estoppel, "plaintiff must offer evidence that it was misled or lulled by the defendant into failing to bring its claim in a timely manner."[44]

"In contrast to when an insured is 'promised repeatedly by agents for the insurer that the loss would be adjusted without litigation,' steps taken by an insurer to investigate a claim do not constitute waiver or estoppel."[45] Failure to "respond to inquiries posed by plaintiff's counsel regarding the status of the investigation" does not "suggest that defendant misrepresented the status of the

---

[43]     *Gilbert Frank Corp.*, 70 N.Y.2d at 968.

[44]     *Enterprise Eng'g, Inc.*, 2004 WL 2997857, at *3 (citing *Gilbert Frank Corp.*, 70 N.Y.2d at 968; *Simcuski v. Saili*, 44 N.Y.2d 442, 449 (1978)). *Accord Phillips v. Dweck*, 750 N.Y.S.2d 910, 911 (3d Dep't 2002) (to show waiver, plaintiffs must show that defendants "engaged in a course of conduct which lulled them into inactivity in the belief that their claim would ultimately be processed, or that they were induced by fraud, misrepresentation or deception to refrain from commencing a timely action") (quotation marks and citation omitted).

[45]     *Enterprise Eng'g, Inc.*, 2004 WL 2997857, at *3 (quoting *Satyam Imports, Inc. v. Underwriters at Lloyd's Via Marsh, S.A.*, No. 03 Civ. 4387, 2003 WL 22349668, at *2 (S.D.N.Y. Oct. 14, 2002). *Accord Minichello*, 758 N.Y.S.2d at 670-71 (quoting *Brown v. Royal Ins. Co. of Am.*, 620 N.Y.S.2d 399, 399 (2d Dep't 1994)) ("'Delay by the insurance carrier in completing its investigation of the claim does not excuse the plaintiff from timely commencing an action, since he or she is bound by the terms of the contract to either commence an action prior to the expiration of the limitations period or obtain a waiver or extension of such provision.'").

-11-

investigation or otherwise lulled plaintiff into inaction."[46] An insurer has no duty

to advise an insured of the limitations period.[47] "Evidence of communications or

settlement negotiations between an insured and its insurer either before or after

expiration of a limitations period contained in a policy is not, without more,

sufficient to prove waiver or estoppel."[48]

## IV. DISCUSSION

### A. Scope of Coverage

The agreement between the parties consists of both the standard terms

of the Policy and the terms of the Warehouse Endorsement. Although the standard

terms of the Policy do not cover NAFT's loss, NAFT has demonstrated that the

Warehouse Endorsement provides all-risk coverage for the goods shipped to the

Cidmate Warehouse.

#### 1. Standard Terms of the Policy

By its standard terms, the Policy covers goods in transit from

warehouse to warehouse—from the time the goods leave the initial warehouse

---

[46] *Phillips*, 750 N.Y.S.2d at 911.

[47] *See Compis Services, Inc. v. Hartford Steam Boiler Inspection and Ins. Co.*, 708 N.Y.S.2d 770, 772 (4th Dep't 2000).

[48] *Id.* at 771-72 (citing *Gilbert Frank Corp.*, 70 N.Y.2d at 968).

-12-

until arrival at the "final port," and thereafter, until delivery to a final warehouse or the expiration of either fifteen or thirty days.[49] Paragraph 12(b) of the Policy provides that, "[e]xcept while subject to an ON DECK Bill of Lading, goods covered sufficiently packed to withstand the intended voyage, are insured: Against All Risks of physical loss or damage from any external cause (excepting all such risks as are excluded by the Paramount Warranties in this Policy)."[50] The parties agree that this clause provides all-risk coverage for insured goods in transit on the seas or in the air.[51] The Policy also contains an American Institute Shore Clause (the "Shore Clause") which provides coverage for certain named perils:

> Where this insurance by its terms covers while on docks, wharves
> or elsewhere on shore, and/or during land transportation, it shall
> include the risks of collision, derailment, overturning or other
> accident to the conveyance, fire, lightning, sprinkler leakage,
> cyclones, hurricanes, earthquakes, floods, (meaning the rising of
> navigable waters), and/or collapse or subsidence of docks or
> wharves, even though the insurance be otherwise F.P.A. (Free of

---

[49]     Policy ¶ 16. The Policy allows thirty days "if the destination to which the goods are insured is outside the limits of the port." *Id.*

[50]     Mitsui does not argue that the goods were subject to an ON DECK Bill of Lading or that the risks were excluded by the Paramount Warranties.

[51]     *See* Defendant's Memorandum of Law in Opposition to Summary Judgement ("Def. Mem.") at 7; Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 4.

Particular Average).[52]

The mysterious disappearance of goods is not expressly included under the Shore

Clause.

## 2. The Warehouse Endorsement

Under the standard terms of the Policy, goods re-shipped to

warehouses for refurbishment were not insured.[53] To cover such goods, the parties

agreed to the Warehouse Endorsement, which provides:

> Subject to all terms and conditions provided under this Special
> Warehouse Endorsement . . . this policy is extended to cover
> Insured merchandise returned to the Suppliers Facilities as listed
> below, whilst Awaiting upgrades, replacements, etc. for return to
> the United States.[54]

In a separate endorsement, the parties agreed that the Cidmate Warehouse was a

supplier's facility for purposes of the Warehouse Endorsement.[55] Paragraph 7 of

the Warehouse Endorsement describes the scope of coverage for goods insured

---

[52]     Policy ¶ 25. This clause is nearly identical to the form Shore Clause
provided by the American Institute of Marine Insurers. *See* American Institute of
Marine Insurers Form 32 B-8, American Institute Cargo Clauses ¶ 10 (1949),
*available at* http://www.aimu.org/aimuforms/32B-8.pdf.

[53]     *See* Policy ¶ 16 (insurance attaches when goods leave the initial
warehouse at the place named in the Policy, and ceases when imported goods
reach the final warehouse at the destination named in the Policy).

[54]     Warehouse Endorsement ¶ 13.

[55]     *See* Endorsement 19.

thereunder:

> (a) Goods and merchandise covered under this Policy during the import voyage *shall be insured under this endorsement subject to the same terms and conditions as applicable during transit from warehouse to warehouse*, except as hereinafter excluded or specifically provided for.

> (b) Goods and merchandise not covered under this Policy during the Import voyage, i.e. property purchased on C.I.F. terms and "Spot" purchases for inclusion with or substitution for bona fide importations, *shall be insured under this endorsement against direct physical loss or damage caused by risks covered under the American Institute Shore Clause contained in this Policy*, except as hereinafter excluded or specifically provided for.[56]

Paragraph 7(a) applies to goods sent by NAFT to the Cidmate Warehouse, because

those goods were covered under the standard terms of the Policy during their

initial import voyage.[57] Mitsui concedes that the telephones were not purchased

on C.I.F. terms or as "Spot" purchases for purposes of paragraph 7(b).[58]

Therefore, NAFT's telephones were insured under paragraph 7(a) of the

Warehouse Endorsement subject to the same terms applicable to goods in transit.

---

[56] Policy ¶ 7 (emphasis added).

[57] *See* Schweitzer Aff. ¶ 5.

[58] *See* Def. Mem. at 11 n.3 ("Mitsui tends to agree—that Section 7(b) of the Endorsement does not apply here, where the goods were not 'property purchased on C.I.F. terms and 'Spot' purchases.'").

-15-

Mitsui interprets paragraph 7(a) to incorporate by reference all of the terms and conditions applicable to goods in transit from warehouse to warehouse, including the Shore Clause applicable to goods "on shore, and/or during land transportation."[59] Mitsui argues that NAFT's loss is not covered because it did not arise from any of the perils named in the Shore Clause.[60] Although this interpretation has some literal appeal, it must be rejected because it would render paragraph 7(b) mere surplusage.[61] If the drafters had intended for the Shore Clause to apply to all goods covered under either paragraph 7(a) or 7(b) the Warehouse Endorsement, they would not have specifically stated that the Shore Clause was applicable to those goods covered under paragraph 7(b).

Furthermore, the Warehouse Endorsement excludes coverage for "[a]ny unexplained loss, mysterious disappearance or loss or shortage disclosed upon taking inventory, at premises *owned, operated or controlled by the Assured*

---

[59]     *See* Def. Mem. at 12-13.

[60]     *See id.* NAFT argues that the standard terms of the Policy cover all risks to goods from warehouse to warehouse, even on shore, and that the Shore Clause does not limit coverage. *See* Pl. Mem. at 20 ("As drafted, this provision does not *exclude* any categories of coverage") (emphasis in original). I do not reach this issue because I hold that the Shore Perils clause does not apply here.

[61]     *See, e.g., Thomas v. NASL Corp.*, No. 99 Civ. 11901, 2000 WL 1725011, at *9 (S.D.N.Y. Nov. 15, 2000) (provisions in marine cargo policy "should not be read in such a way as to make them meaningless").

*or his employees.*"[62] This clause excludes coverage for mysterious disappearance of goods only from buildings controlled by the insured.[63] An insurer who believed that the Warehouse Endorsement covered only those perils named in the Shore Clause would have no need for this exclusion.

Where an insurance policy's meaning is not clear, a court must resolve ambiguities in favor of the insured.[64] Accordingly, I conclude that the Warehouse Endorsement provided all-risk coverage for the goods NAFT lost at the Cidmate Warehouse. Because NAFT has demonstrated the existence of all-risk coverage for its loss, it need not prove the cause of the loss.[65] Mitsui has not argued that any express exception to this coverage is applicable.

## B. Time-Bar

Mitsui argues that NAFT's claim is barred by paragraph 49 of the Policy, which provides that "[n]o suit or action or proceeding against this Company for the recovery of any claim shall be sustainable unless commenced

---

[62]    Warehouse Endorsement ¶ 8 (emphasis added).

[63]    Mitsui does not argue that the Cidmate Warehouse was controlled by NAFT.

[64]    *See, e.g., Pepper v. Allstate Ins. Co.*, 799 N.Y.S.2d 292, 294 (3d Dep't 2005).

[65]    *See In re Balfour MacLaine Intern. Ltd.*, 85 F.3d at 77.

-17-

within one year from the date of the happening of the accident out of which the claim arises."[66] NAFT argues *first*, that the limitations clause does not apply to the claim because the loss of the telephones was not an accident, *second*, that the Standstill Agreement preserved its right to file suit, and *third*, that Mitsui lulled NAFT into failing to file suit with its year-long investigation.[67] Although NAFT's legal arguments are without merit, Mitsui has not carried its burden of demonstrating that the cause of action accrued over a year before NAFT preserved its right to file suit.

## A. Applicability of the Limitations Clause

NAFT argues that the limitations clause does not apply because an accident is a loss that is not the product of human intention, and that its loss was caused by the intentional removal of the telephones from the Cidmate Warehouse by unknown persons.[68] The Policy does not define the term accident. "An 'accident,' under New York insurance law, is an event which from the insured's

---

[66]    Policy ¶ 49.

[67]    *See* Pl. Mem. at 22-24.

[68]    *See id.* at 24 (citing Webster's New World Dictionary (2d College ed.)) (an accident is an "unintended happening"); *Hubel v. Madison Mut. Ins. Co.*, No. 2001-5405, 2003 WL 21425624, at *6 (N.Y. Sup. Ct. Onondaga Co. May 16, 2003) ("Clearly, an intentional act is not an accident.")).

-18-

point of view 'was unexpected, unusual and unforeseen.'"[69] The New York Court of Appeals has held that "the term 'accidental' includes not only an unintended event but also one occurring unexpectedly or by chance."[70] Here, the removal of NAFT's goods from the Cidmate Warehouse was an accident because *NAFT* did not intend, expect, or foresee it.[71]

The Policy's limitations clause applies to this action because it applies to all actions "for the recovery of *any* claim."[72] The Policy expressly covers risks which are the result of intentional acts.[73] Therefore, NAFT's interpretation of the word "accident" renders the clause meaningless with regard to

---

[69] *Commercial Union Assur. Co., PLC v. Oak Park Marina, Inc.*, 198 F.3d 55, 59 (2d Cir. 1999) (citations omitted).

[70] *Northville Ind. Corp. v. National Union Fire Ins. Co.*, 657 N.Y.S.2d 564, 567 (1997) ("This meaning of accidental is well recognized and has generally been applied in construing insurance policies.") (quotation marks, citations, and emphasis omitted).

[71] *Hubel*, the case cited by NAFT in support of its argument, held only that an occurrence caused by insured's intentional act of discrimination was not an accident covered by the commercial landlord's liability policy. *See* 2003 WL 21425624, at *13. Such an act was not unexpected, unforeseen, or unintended from the insured's perspective.

[72] Policy ¶ 49 (emphasis added).

[73] *See id.* ¶ 10 (covered perils include "assailing thieves" and "barratry of the master and mariners").

-19-

many potentially covered losses.[74]

NAFT argues that if the drafters of the Policy had intended to extend the one-year limitations period to all losses, they would have "used a term such as 'peril,' 'loss,' or 'risk,' which appear elsewhere in the Policy, and not 'accident,'" which is a more limited term.[75] But the Policy refers to perils and risks to mean potential harms that have not yet materialized.[76] The Policy refers to loss, damage, liability, and expense as the results of accidents giving rise to claims.[77] The Policy refers to accidents infrequently, and where it does, it uses the word to mean the event or occurrence giving rise to the insured's loss, as opposed to a risk or the loss itself. For example, the Shore Clause covers occurrences such as "the risks of

---

[74]    *See Thomas*, 2000 WL 1725011, at *9; *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 165 (2d Cir. 2005) ("In interpreting an insurance contract under New York law, a court must strive to give meaning to every sentence, clause, and word.") (quotation marks and citation omitted).

[75]    Plaintiff's Reply Memorandum in Support of Its Motion for Summary Judgment at 24.

[76]    *See, e.g.*, Policy ¶ 10 (to describe covered and uncovered potential occurrences, the Policy uses terms such as adventures, perils, losses, and misfortunes).

[77]    *See, e.g., id.* ¶ 11 ("All Risks of physical loss or damage from any external cause"), *id.* ¶ 14 ("loss, damage, liability or expense arising directly or indirectly").

collision, derailment, overturning or other *accident* to the conveyance."[78]

Although insurance contracts are to be construed strictly against the insurer, where only one reasonable interpretation of a policy is possible, the court must give effect to the plain meaning of the policy.[79]

## B.    The Standstill Agreement

The Standstill Agreement preserved the parties' rights to file suit as of April 18, 2005. NAFT incorrectly contends that the date it gave notice of its claim to its broker triggered the limitations period.[80] The Policy provides that no action is sustainable "unless commenced within one year from the date of the happening of the accident out of which the claim arises."[81]

However, Mitsui has not carried its burden of proving that the accident out of which the claim arises occurred prior to April 18, 2004. Schweitzer stated during his deposition that he retained the Horizon law firm to investigate the Cidmate Warehouse on April 14, 2004, a "day or two" after his

---

[78]    *Id.* ¶ 25 (emphasis added).

[79]    *See Sanabria v. American Home Assurance Co.*, 508 N.Y.S.2d 416, 416 (1986).

[80]    *See* Pl. Mem. at 23.

[81]    Policy ¶ 49.

inspectors were unable to gain access to that facility.[82] This proves only that inspectors were unable to gain access to the facility, not that the goods were removed prior to April 14, 2004. The Horizon Letter states that Horizon visited the Cidmate Warehouse on three unspecified occasions between April 15 and April 22, 2004, and found the Cidmate Warehouse empty.[83] Interpreting this evidence in the light most favorable to Mitsui, the Horizon Letter does not prove that the Warehouse was empty prior to April 18, 2004. The letter states that local authorities and residents "suggested" that the goods must have been improperly removed between April 2, 2004 and April 11, 2004.[84] But the second-hand speculation of unidentified witnesses does not prove the precise date of the accident, which is a material fact.

Even if this speculation were true, NAFT missed the limitations period by only *one week*. Mitsui asks this Court to make a precise factual determination not supported by the undisputed evidence viewed in the light most

---

[82] Schweitzer Dep. at 33. NAFT admits that it received information from an inspection service in China that it was unable to gain access to the Cidmate Facility to perform a routine inspection of goods in "early April." NAFT 56.1 Statement ¶ 12.

[83] *See* Horizon Letter at 1.

[84] *See id.* at 2.

-22-

favorable to NAFT. Because Mitsui has not proven that NAFT's loss occurred

prior to April 18, 2004, I will not grant summary judgment on Mitsui's time-bar

argument.

## C.    Waiver and Estoppel

Finally, NAFT argues that its delay in bringing this action was caused

by Mitsui's year long investigation and failure to decline coverage until May 2,

2005. But New York law is clear that delay caused by an insurer's investigations

is not an excuse for failure to bring an action.[85]   NAFT could have preserved its

rights under the Policy by entering into a standstill agreement or by filing an

action.

NAFT points out that the grounds cited in the Declination Letter did

not relate to any of the subjects that Mitsui investigated between April 2004 and

April 2005.[86] NAFT argues that because Mitsui knew from the outset that the

goods were lost at the Cidmate Warehouse, if it genuinely believed such an event

was not a covered peril under the Policy, it would have raised this ground for

declination initially.[87] Even assuming this is true, NAFT has not demonstrated

---

[85]     *See Phillips*, 750 N.Y.S.2d at 911.

[86]     *See* Pl. Mem. at 23.

[87]     *See id.*

-23-

that Mitsui took any action that would have lulled a reasonable insured into delaying the filing of this litigation.[88] Mitsui did not make any promise that it would pay NAFT's claim if its investigations verified the facts alleged by NAFT. The Margolies Letter stated only that Mitsui would respond after its analysis of the claim was complete. In sum, no reasonable insured could have read that letter to imply a promise to make payment.

## V. CONCLUSION

For the foregoing reasons, NAFT's motion for summary judgment is granted in part and denied in part and Mitsui's cross-motion is denied. The Clerk of the Court is directed to close this motion (Docket #14). A conference is scheduled for February 8, 2006 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 27, 2006

---

[88]      *See, e.g., Enterprise Eng'g, Inc.*, 2004 WL 2997857, at *3 (continuous communications, settlement negotiations, and partial payment of claim insufficient to show waiver or estoppel).

-24-

## - Appearances -

*For Plaintiff:*

Joseph F. Donley, Esq.
Rodney M. Zerbe, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

John F. Ryan, Esq.
DONOVAN PARRY MCDERMOTT & RADZIK
Wall Street Plaza
88 Pine Street - 21st Floor
New York, New York 10005-1801
(212) 376-6400

*For Defendant:*

Francis A. Montbach, Esq.
Jacqueline K. Seidel, Esq.
MOUND, COTTON, WOLLAN & GREENGRASS
One Battery Park Plaza
New York, New York 10004
(212) 804-4200