**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                :

**NORTH AMERICAN FOREIGN TRADING**  :
**CORP.,**                                :
                                :

            **Plaintiff,**         :

       **- against -**          :

**MITSUI SUMITOMO INSURANCE USA,**  :
**INC., f/k/a MITSUI MARINE AND FIRE**  :
**INSURANCE COMPANY OF AMERICA and**  :
**MSI CLAIMS (USA), INC.,**            :
                                :

           **Defendants.**     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                :

**NORTH AMERICAN FOREIGN TRADING**  :
**CORP.,**                                :
                                :

            **Plaintiff,**         :

       **- against -**          :

**MITSUI SUMITOMO INSURANCE USA,**  :
**INC., f/k/a MITSUI MARINE AND FIRE**  :
**INSURANCE COMPANY OF AMERICA and**  :
**MSI CLAIMS (USA), INC.,**            :
                                :

           **Defendants.**     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/7/06

<u>**OPINION AND ORDER**</u>

**05 Civ. 4807 (SAS)**

**05 Civ. 5827 (SAS)**

## I.    INTRODUCTION

North American Foreign Trading Corp. ("NAFT") brings this action against Mitsui Sumitomo Insurance USA, Inc., formerly known as Mitsui Marine and Fire Insurance Company of America, and MSI Claims (USA), Inc. (collectively, "Mitsui") for breach of a marine insurance policy issued by Mitsui to NAFT.  Mitsui now moves for summary judgment arguing that NAFT's claim is time-barred under the policy.  For the following reasons, Mitsui's motion for summary judgment is denied.[1]

## II.    FACTS

NAFT is an importer of consumer electronic goods manufactured in Asia.  Mitsui issued a marine insurance policy to NAFT covering shipments from

---

[1]    This action was formally consolidated on February 17, 2006 with a prior action brought by NAFT, No. 05 Civ. 4807.  *See* 2/17/06 Stipulation and Order of Consolidation.  The first action involves a claim for breach of the same policy at issue in this action, but pertains to a different loss sustained by NAFT. *See North American Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 413 F. Supp. 2d 295, 297-99 (S.D.N.Y. 2006).  In the first action, I granted summary judgment for NAFT on the ground that Mitusi's policy covered NAFT's lost goods and denied summary judgment for Mitsui on the ground that Mitsui failed to show NAFT's claim was time-barred under the policy. *See id.* at 302, 304.  I also held that Mitsui was entitled to assert a limitations defense because it did not lull NAFT into waiting to file suit. *See id.* at 306-07.

Asia, effective March 1, 2001 (the "Policy").[2]  The parties entered into an

endorsement extending coverage under the Policy to goods temporarily stored in

certain warehouses (the "Warehouse Endorsement"), including a facility owned by

Lionda Technology Co., Ltd. ("Lionda") in Baoan, Shenzhen, China (the "Lionda

Warehouse").[3]

   Between 2001 and 2004, NAFT purchased newly manufactured

cordless telephones from Lionda in China, and returned certain of those

telephones, known as "customer returned units" or "CRUs", to Lionda for

refurbishment at the Lionda Warehouse.[4]  In early 2004, NAFT determined that

many of its CRUs that had been shipped to Lionda were never returned to NAFT.[5]

NAFT ultimately determined that approximately 297,778 CRUs valued at

$7,245,345 had been shipped to the Lionda Warehouse but were never returned to

---

[2]   *See* Mitsui Marine and Fire Insurance Company of America Open
Cargo Policy No. OCMM 01000, Ex. D to Affidavit of Francis A. Montbach,
Counsel to Mitsui, in Support of Defendants' Motion for Summary Judgment
("Montbach Aff.").

[3]   *See* Special Warehouse Coverage Endorsement to Policy No. OCMM
01000, Ex. D to Montbach Aff.

[4]   *See* Complaint ("Compl.") ¶¶ 12-13; Statement of Claim, *North
American Foreign Trading Corp. v. Shenzhen Lionda Group Corp.*, Index No. 50
181 T 00251 04 (Am. Arbitration Ass'n, Nov. 15, 2004) ("Arbitration Claim"),
Ex. F to Montbach Aff. ¶¶ 15, 20.

[5]   *See* Compl. ¶ 13.

NAFT.[6]  On March 8, 2004, NAFT wrote to Lionda claiming that Lionda was

attempting to misappropriate NAFT's goods and that Lionda was violating its

contractual obligations with NAFT by holding and not returning NAFT's CRUs.[7]

On April 20, 2004, Lionda informed NAFT that all of NAFT's CRUs were secured

in the Lionda Warehouse.[8]  On the same day, Lionda e-mailed photographs to

NAFT that purported to show NAFT's merchandise inside Lionda's facility.[9]

On April 30, 2004, due to a separate dispute between Lionda and its

creditors, the Shenzhen Intermediate People's Court, Guangdong Province, sealed

the Lionda Warehouse.[10]  On May 10, 2004, NAFT filed a Demand for Arbitration

---

[6]      *See id.* ¶¶ 16-17, 27.

[7]      *See* 3/8/04 Letter from Robert Schweitzer of NAFT, to Mr. Chairman
Lee of Lionda, demanding return of NAFT's merchandise, Ex. M to Montbach
Aff.

[8]      *See* 4/20/04 Letter from Ge Wei Ming, Chairman of Lionda, to
Andrew Lowinger, President of NAFT, responding to NAFT's concern about its
CRUs, Ex. 4 to Affidavit of Daniel A. Lebersfeld, Counsel to NAFT, in Support to
Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for
Summary Judgment ("Lebersfeld Aff.").

[9]      *See* 4/20/04 E-Mail to Robert Schweitzer, attaching photos of the
Lionda Warehouse, Ex. 5 to Lebersfeld Aff.

[10]      *See* 6/21/06 Translation of Shenzhen Intermediate People's Court,
Guandong Province, Seal-Up Notice (2004) No. 97, Shen Zhong Fa Li Cai Zi,
April 30, 2004, Ex. O to Montbach Aff.; *see also* Shenzhen Intermediate People's
Court, Guandong Province, Seal-Up Notice (2004) No. 97, Shen Zhong Fa Li Cai
Zi, April 30, 2004, Ex. N to Montbach Aff.

for "[b]reach of contract" against Lionda because of Lionda's "failure to repair or replace customer returned units."[11] Around this time, NAFT hired counsel in China, Anderson & Anderson LLP, to investigate whether NAFT's CRUs were still located in the Lionda Warehouse.[12] In June 2004, Anderson & Anderson initially suspected that NAFT's CRUs were stolen because Anderson & Anderson investigators observed a "gaping hole" in the wall of the Lionda Warehouse.[13] However, Anderson & Anderson did not confirm that NAFT's CRUs were actually removed from the Lionda Warehouse until July 26, 2004.[14] At that time, one of Anderson & Anderson's employees, Wei Zhijun, learned that Lionda was repairing and selling NAFT's CRUs at its Wan Cheng Warehouse in the Futian Customs Zone ("Wan Cheng Warehouse"), which was not covered by the Policy.[15] Zhijun "estimated that there were several hundred thousand boxes . . . containing

---

[11]     5/10/04 Demand for Arbitration Against Shenzhen Lionda Group Corp. ("Arbitration Demand"), Ex. E to Montbach Aff.

[12]     *See* Compl. ¶ 13.

[13]     6/23/04 Letter from David C. Buxbaum, Chinese counsel to NAFT, to Schweitzer ("Buxbaum Letter"), Ex. A to Montbach Aff. at 2.

[14]     *See* 1/14/05 Affidavit of Wei Zhijun, *North American Foreign Trading Corp. v. Shenzhen Lionda Group Corp.*, Index No. 50 181 T 00251 04 (Am. Arbitration Ass'n, Nov. 15, 2004) ("Zhijun Aff."), Ex. L to Montbach Aff. ¶ 6.

[15]     *See id.*

NAFT's CRUs" at the Wan Cheng Warehouse.[16]  Anderson & Anderson was

unable to gain access to the Lionda Warehouse until shortly after it was unsealed

in December 2004.[17]  On December 31, 2004, Zhijun visited the Lionda

Warehouse and reported that "[t]here were no NAFT's [sic] CRUs in the

warehouse that [she] could see."[18]

On June 25, 2004, NAFT advised its insurance broker, Roanoke

Trade Services, Inc. ("Roanoke"), of Anderson & Anderson's findings as of that

time and requested that Roanoke notify Mitsui about NAFT's problem regarding

the CRUs.[19]  NAFT further stated that "it appears that there are large gaps in the

inventory that should have been held in the Lionda warehouse."[20]  On June 29,

Roanoke forwarded NAFT's correspondence to Mitsui.[21]

---

[16]     *Id.*

[17]     *See* 2/2/05 Affidavit of Wei Zhijun *North American Foreign Trading Corp. v. Shenzhen Lionda Group Corp.*, Index No. 50 181 T 00251 04 (Am. Arbitration Ass'n, Nov. 15, 2004), Ex. K to Montbach Aff. ¶¶ 7-12.

[18]     Visit to Lionda Technology's Offices, Warehouse and Factory on 31st December 2004, Ex. E to Zhijun Aff.

[19]     *See* 6/25/04 Letter from G. James Zerka of NAFT to Greg Taylor of Roanoke Trade Services, Inc., Ex. A to Montbach Aff.

[20]     *Id.*

[21]     *See* 6/29/04 Facsimile from Taylor to Marvin Margolies, Vice President and Marine Claims Manager, MSI Claims USA Inc., Ex. A to Montbach

Mitsui retained forensic accountants, Meaden & Moore, LLP to investigate NAFT's claim.[22]  Between June 2004 and May 2005, Meaden & Moore met with NAFT's Chief Financial Officer on several occasions, reviewed documentation regarding NAFT's shipments to Lionda and supporting letters of credit, and visited NAFT's office to discuss questions and concerns.[23]

In response to an inquiry from NAFT regarding the status of the claim, Marvin Margolies, a Vice President and Marine Claims Manager for Mitsui, wrote in November 2004 that "due to the nature of this claim, the amount involved and the status of Meaden & Moore's review," Mistusi was "currently not in a position to respond affirmatively to your request."[24]  Margolies informed NAFT that Mitsui would respond "[a]s soon as [it was] in a position to . . . do so."[25]  On April 29, 2005, Meaden & Moore sent a draft of its report to Margolies,

---

Aff.

[22]    *See* Affidavit of Mavin J. Margolies in Support of Defendants' Motion for Summary Judgment ("Margolies Aff.") ¶ 3.

[23]    *See* 5/25/05 Letter from Meaden & Moore, LLP to Montbach regarding NAFT's stock loss at Lionda ("Meaden & Moore May 25 Report"), Ex. 3 to Lebersfeld Aff. at 2-4.

[24]    11/2/04 Letter from Margolies to Taylor ("Margolies Letter"), Ex. 11 to Lebersfeld Aff.

[25]    *Id.*

which stated that Meaden & Moore had "found no material difference between the $7,245,345 claimed as goods returned to Lionda for repair and never received and the documentation supporting the actual shipment to Lionda as well as the valuation of these goods at cost."[26]  Margolies forwarded the report to Mitsui's counsel so that Mitsui's counsel could render a coverage opinion.[27]

On May 24, 2005, Mitsui's counsel provided its opinion to Mitsui that the Policy did not provide coverage for NAFT's claim and attached a draft declination letter addressed to NAFT for Mitsui's review.[28]  On May 25, 2005, in response to a telephone message inquiring about the status of NAFT's claim, Margolies sent an e-mail to NAFT's broker stating that Margolies had "requested and [was] awaiting Meaden & Moore's report, and [would] update [him] hopefully next week."[29]  On the same day, Meaden & Moore forwarded its final report to Mitsui's counsel, which stated the same conclusion as that in Meaden & Moore's

---

[26]    4/29/05 Draft Letter from Meaden & Moore, LLP to Margolies regarding NAFT's stock loss at Lionda ("Meaden & Moore April 29 Report"), Ex. 12 to Lebersfeld Aff. at 4.

[27]    *See* 4/24/05 Letter from Montbach to Margolies, providing coverage opinion for NAFT's claim ("Montbach Letter"), Ex. A to 10/24/06 Letter from Joseph Donley, counsel to NAFT, to the Court; *see also* Margolies Aff. ¶ 5.

[28]    *See* Montbach Letter.

[29]    5/25/05 E-Mail from Margolies to Taylor ("Margolies-Taylor E-Mail"), Ex. 14 to Lebersfeld Aff.

April 29 report.[30]  NAFT did not review Meaden & Moore's report at that time.[31]

On May 26, 2005, Margolies forwarded the opinion of Mitsui's counsel and the

proposed declination letter to his superior "requesting authority to issue the letter

of declination."[32]

Under the Policy, Mitsui was required to make payment to NAFT

"within thirty (30) days after proof of loss, proof of interest and adjustment."[33]  In

a letter dated June 16, 2005, Mitsui denied coverage for NAFT's claim, stating

that the "loss was not due to any insured peril" and quoting paragraphs 1, 7(a),

7(b), and 13 of the Warehouse Endorsement, and paragraph 25 of the Policy,

pertaining to the scope of coverage for goods on shore.[34]

---

[30]      *See* Meaden & Moore May 25 Report at 4.

[31]      *See* Memorandum of North American Foreign Trading Corp. in
Opposition to Defendants' Motion for Summary Judgment ("Opp. Mem.") at 24.
In fact, NAFT claims Mitsui did not furnish Meaden & Moore's report to NAFT
until after the commencement of this action.  *See id.*

[32]      5/26/05 E-Mail from Margolies to Lowden, Vice President, Claims
Technical Manager at Mistui ("Margolies-Lowden E-Mail"), Ex. 10 to Lebersfeld
Aff.; *see also* Margolies Aff. ¶¶ 3, 7.

[33]      Policy ¶ 46.

[34]      6/15/05 Letter from Margolies to Taylor ("Declination Letter"), Ex.
15 to Lebersfeld Aff. at 1-3.

NAFT filed this action on June 23, 2005.  Mitsui claims that the action is time-barred because the Policy provides for a one-year limitations period from the date of loss in which to file suit.  NAFT argues that Mitsui has not carried its burden of proving NAFT's loss occurred before June 23, 2004, or alternatively that Mitsui should be equitably estopped from asserting a limitations defense because Mitsui lulled NAFT into withholding suit.

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[35]  "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[36]  A fact is material when "it 'might affect the outcome of the suit under the governing

---

[35]    Fed. R. Civ. P. 56(c).

[36]    *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

law.'"[37]  The movant has the burden of demonstrating that no genuine issue of material fact exists.[38]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, it must do more than show that there is a "'metaphysical doubt as to the material facts,'"[39] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[40]  In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[41]

### B.    Time Bar

Under New York law, parties to a contract may designate a reasonable period of limitations within which a claim arising out of the contract is

---

[37]    *Id.* (quoting *Anderson*, 477 U.S. at 248).

[38]    *See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[39]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[40]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[41]    *See, e.g., Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

-11-

to be commenced, even if that period is shorter than the statutory period.[42]  New

York courts have held that a one-year time limitation to bring suit for breach of an

insurance contract is reasonable and enforceable.[43]  The defendant has the initial

burden of establishing that the limitations period in the policy expired prior to the

commencement of the action.[44]

Once the defendant has met its burden, the plaintiff has the burden "to

aver evidentiary facts establishing that the case at hand falls within an exception to

the limitations period," such as waiver or estoppel.[45]  In order to establish waiver,

"plaintiff must present evidence from which the defendant's intent to relinquish

the protection of the contractual limitations period can be reasonably inferred."[46]

---

[42]     *See* N.Y. Civ. Prac. L. & R. § 201.  Here, the parties assume that New York law controls this dispute and their implied consent "is sufficient to establish choice of law."  *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000).

[43]     *See, e.g., Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 967 (1988).

[44]     *See Neary v. Nationwide Mut. Fire Ins. Co.*, 791 N.Y.S.2d 840 (2d Dep't 2005) (citing *Minichello v. Northern Assurance Co. of Am.*, 758 N.Y.S.2d 669, 670-71 (2d Dep't 2003)).

[45]     *Id.* (citing *Minichello*, 758 N.Y.S.2d at 670-71).

[46]     *Enterprise Eng'g, Inc. v. Hartford Fire Ins. Co.*, No. 04 Civ. 5018, 2004 WL 2997857, at *3 (S.D.N.Y. Dec. 23, 2004).  *Accord Gilbert Frank Corp.*, 70 N.Y.2d at 968.

-12-

Waiver "should not be lightly presumed."[47]  To establish estoppel, "plaintiff must

offer evidence that it was misled or lulled by the defendant into failing to bring its

claim in a timely manner."[48]  Such conduct must occur within the limitations

period.[49]

      "In contrast to when an insured is 'promised repeatedly by agents for

the insurer that the loss would be adjusted without litigation,' steps taken by an

insurer to investigate a claim do not constitute waiver or estoppel."[50]  Failure to

---

[47]     *Gilbert Frank Corp.*, 70 N.Y.2d at 968.

[48]     *Enterprise Eng'g, Inc.*, 2004 WL 2997857, at *3 (citing *Gilbert Frank Corp.*, 70 N.Y.2d at 968; *Simcuski v. Saili*, 44 N.Y.2d 442, 449 (1978)). *Accord Phillips v. Dweck*, 750 N.Y.S.2d 910, 911 (3d Dep't 2002) (to show waiver, plaintiffs must show that defendants "engaged in a course of conduct which lulled them into inactivity in the belief that their claim would ultimately be processed, or that they were induced by fraud, misrepresentation or deception to refrain from commencing a timely action") (quotation marks and citation omitted).

[49]     *See Gardner-Denver Co. v. DIC-Underhill Constr. Co.*, 416 F. Supp. 934, 937 n.8 (S.D.N.Y. 1976) ("In general, to operate as a waiver by the company of, or an estoppel to assert, a condition in the policy limiting the time in which suit shall be brought after the loss, the act or declaration relied upon must be done or made during the running of the period of limitation, or at least commenced during such period, since acts taking place entirely after the expiration period cannot be said to have induced the insured not to bring action within the period.") (quotation marks and citation omitted).

[50]     *Enterprise Eng'g, Inc.*, 2004 WL 2997857, at *3 (quoting *Satyam Imports, Inc. v. Underwriters at Lloyd's Via Marsh, S.A.*, No. 03 Civ. 4387, 2003 WL 22349668, at *2 (S.D.N.Y. Oct. 14, 2002). *Accord Minichello*, 758 N.Y.S.2d at 670-71 (quoting *Brown v. Royal Ins. Co. of Am.*, 620 N.Y.S.2d 399, 399 (2d Dep't 1994)) ("'Delay by the insurance carrier in completing its investigation of

-13-

"respond to inquiries posed by plaintiff's counsel regarding the status of the investigation" does not "suggest that defendant misrepresented the status of the investigation or otherwise lulled plaintiff into inaction."[51]  An insurer has no duty to advise an insured of the limitations period.[52]  "Evidence of communications or settlement negotiations between an insured and its insurer either before or after expiration of a limitations period contained in a policy is not, without more, sufficient to prove waiver or estoppel."[53]

## IV.   DISCUSSION

### A.   Time-Bar

Mitsui argues that NAFT's claim is barred by paragraph 49 of the Policy, which provides that "[n]o suit, action or proceeding against this Company for the recovery of any claim shall be sustainable unless commenced within one year from the date of the happening of the accident out of which the claim

---

the claim does not excuse the plaintiff from timely commencing an action, since he or she is bound by the terms of the contract to either commence an action prior to the expiration of the limitations period or obtain a waiver or extension of such provision.'").

[51]     *Phillips*, 750 N.Y.S.2d at 911.

[52]     *See Compis Servs., Inc. v. Hartford Steam Boiler Inspection and Ins. Co.*, 708 N.Y.S.2d 770, 772 (4th Dep't 2000).

[53]     *Id.* at 771-72 (citing *Gilbert Frank Corp.*, 70 N.Y.2d at 968).

-14-

arises."[54]  NAFT argues that the loss of the CRUs occurred less than one year prior

to the commencement of this suit, or alternatively, that Mitsui lulled NAFT into

failing to file suit with its year-long investigation.[55]  Mitsui has not carried its

burden of demonstrating that the loss of the CRUs occurred over a year before

NAFT filed suit.

   *First*, Mitsui argues that because the Lionda Warehouse was sealed

on April 30, 2004 and did not contain any of NAFT's CRUs when it was unsealed

in December 2004, NAFT's CRUs must have been removed from the Lionda

Warehouse before it was sealed.[56]  Mitsui's argument relies on the assumption that

the seal on the Lionda Warehouse remained airtight until December 2004.  On

June 23, 2004, Anderson & Anderson reported that there was a "gaping hole" in

the wall of the Lionda Warehouse.[57]  Even if the hole in the Lionda Warehouse

wall existed prior to June 23, 2004, Mitsui has not submitted evidence that proves

NAFT's CRUs were removed from the warehouse prior to that date.  The earliest

---

[54]  Policy ¶ 49.

[55]  *See* Opp. Mem. at 1-2.

[56]  *See* Memorandum of Mitsui Sumitomo Ins. USA, Inc. For Its Motion
for Summary Judgment ("Def. Mem.") at 13; Reply Memorandum of Mitsui
Sumitomo Ins. USA, Inc. For Its Motion for Summary Judgment ("Reply Mem.")
at 9.

[57]  Buxbaum Letter at 2.

date that Mitsui has shown NAFT's CRUs appeared outside of the Lionda Warehouse was on July 26, 2004, when Zhijun reported that NAFT's CRUs were housed at Lionda's Wan Cheng Warehouse.[58]  Interpreting this evidence in the light most favorable to NAFT, this evidence does not prove NAFT's loss occurred prior to June 23, 2004, it only shows that NAFT's loss occurred prior to July 26, 2004, which is within the limitations period.

*Second*, Mitsui argues that NAFT's CRUs must have been removed from the Lionda Warehouse prior to June 23, 2004 because prior to that date, NAFT alleged to Chinese authorities that NAFT's CRUs were removed from the Lionda Warehouse and Anderson & Anderson speculated that NAFT's CRUs were missing.  For example, NAFT signed a letter addressed to the Baoan Public Security Bureau on May 17, 2004 (the "May 17 Letter") alleging that "before the warehouses were sealed," Lionda stole NAFT's merchandise and moved it "to another public warehouse."[59]  Mitsui cites an Anderson & Anderson report as

---

[58]     *See* Report of Investigation of Shenzhen Lionda Group Corp. Offices and Wan Cheng Warehouse on 26th July 2004, Ex. B to Zhijun Aff.

[59]     Translation of 5/17/04 Letter from Schweitzer to Baoan Public Security Bureau on behalf of NAFT, Ex. R to Montbach Aff.; *see also* 5/17/04 E-Mail from Marco Chin of Anderson & Anderson to Schweitzer enclosing Letter from Schweitzer to Baoan Public Security Bureau on behalf of NAFT, Ex. Q to Montbach Aff.

evidence that the May 17 Letter was submitted to the Economic Crime

Investigation Brigade of the Baoan District Public Security Bureau on May 19,

2004.[60]  NAFT argues that the May 17 Letter was only a draft exchanged between

NAFT and Anderson & Anderson, that there is no evidence the letter was

submitted to the Chinese authorities, and that the Anderson & Anderson Report

describes a different letter from NAFT to the Baoan Public Security Bureau

"requesting the prevention of [Lionda] from stealing NAFT's property."[61]  In

addition, the Anderson & Anderson Report states that on May 18, 2004, Anderson

& Anderson investigators learned from the Shenzhen Intermediate People's Court

that the "Lionda Company was sealed and closed down at the request of its major

creditors" and recommended that NAFT "need[ed] to apply to preserve [its]

goods" so the CRUs would not "be detained by the court when the case is over."[62]

The Anderson & Anderson Report further states that on May 19, 2004, Anderson

& Anderson investigators entered the Lionda premises and confirmed with Lionda

---

[60]     *See* Def. Mem. at 6 (citing Report on Investigation and Report to
Police of Shenzhen Lionda Technology Co. Ltd. Case ("Anderson & Anderson
Report"), Ex. S to Montbach Aff. at 1).

[61]     Anderson & Anderson Report at 1.

[62]     *Id.* at 6.

personnel that the warehouse that had been sealed and closed down was "the one where NAFT merchandise was placed."[63]

On these facts, it is unclear what allegation NAFT actually made to the Chinese authorities. The Anderson & Anderson Report suggests that at the time the report was written, Anderson & Anderson investigators believed the CRUs were sealed inside the Lionda Warehouse, which would explain why NAFT's May 19 letter to the Chinese authorities referenced in the Anderson & Anderson Report was concerned with preventing the theft of the CRUs. However, even if NAFT did in fact allege that the CRUs were removed by Lionda before the Lionda Warehouse was sealed, it is only an allegation — it is not proof of loss.[64] Mitsui's only evidence that the CRUs were removed from the Lionda Warehouse prior to when it was sealed was that the Lionda Warehouse did not contain the CRUs when it was unsealed, which as discussed above, is not sufficient to grant Mitsui's motion. NAFT's allegation to the Chinese authorities, without more, is also not sufficient to grant Mitsui's motion. "[T]he year-for-suit clause is

---

[63]    *Id.* at 4.

[64]    Mitsui has neither submitted evidence supporting NAFT's alleged statement nor has it shown that the alleged statement was true.

triggered by *the date of the loss*," not when NAFT became suspicious that a loss

occurred.[65]

Mitsui also cites Anderson & Anderson's June 17 report to NAFT as

evidence that NAFT's CRUs were removed from the Lionda Warehouse prior to

June 23, 2004.[66]  The report stated that Anderson & Anderson had "been informed

by others [that] large quantities of NAFT's CRUs have been removed from [the

Lionda] warehouse and are missing."[67]  Anderson & Anderson's statement only

describes second-hand information supplied by unidentified witnesses and does

not prove that the CRUs were removed from the Lionda Warehouse prior to June

23, 2004.  In any event, even if Anderson & Anderson's statement proves NAFT's

---

[65]     Reply Mem. at 5 (emphasis in original).  Mitsui also cites a May 13, 2004 letter written by Schweitzer to Lionda as evidence that NAFT's suit is time-barred.  *See* Def. Mem. at 5-6.  In his letter, Schweitzer accuses Lionda of "conspiring to and moving merchandise out of the factory."  5/13/04 Letter from Schweitzer to Lionda, Ex. P to Montbach Aff.  NAFT argues that Schweitzer later testified that his May 13 letter does not refer to NAFT's CRUs, it refers to newly manufactured merchandise not at issue in this litigation and that Schweitzer testified his accusation was based on "rumor" and "conjecture."  *See* Opp. Mem. at 5-6; Schweitzer Deposition Transcript, Ex. 1 to Lebersfeld Aff. at 63-66.  Mitsui replies that the Court should not believe Scheweitzer's testimony.  *See* Reply Mem. at 3.  These arguments raise questions of fact as to what specific merchandise Schweitzer referred to in his May 13 letter and the credibility of Schweitzer's deposition testimony, which cannot be resolved on this motion.

[66]     *See* Def. Mem. at 7-8.

[67]     6/17/04 Letter from Buxbaum to Schweitzer, Ex. V to Montbach Aff.

-19-

loss occurred prior to June 23, 2004, the statement does not prove that NAFT's

loss occurred prior to May 25, 2004.  As discussed below, Mitsui is estopped as a

matter of law from asserting a limitations defense if the trier of fact determines

that NAFT's loss occurred after May 25, 2004.[68]

     *Finally*, Mitsui argues that because NAFT filed a demand for

arbitration on May 10, 2004 against Lionda, the loss of the CRUs must have

occurred prior to that date.[69]  However, NAFT commenced an arbitration for

"[b]reach of contract" against Lionda because of Lionda's "failure to repair or

replace customer returned units."[70]  NAFT's arbitration demand does not assert or

provide any evidence that the CRUs were removed from the Lionda Warehouse.

In fact, during the arbitration proceedings that took place after June 23, 2004,

NAFT claimed that Lionda still possessed the CRUs.[71]  NAFT's arbitration

---

[68]    *See infra* Part IV.B.  Mitsui also relies on a NAFT Bill of Complaint
dated June 23, 2004 that asks the Shenzhen People's Intermediate Court to direct
Lionda to "cease and desist from hiding and transferring" NAFT's CRUs.  Bill of
Complaint, Ex. X to Montbach Aff. at 1.  As NAFT's Bill of Complaint is dated
exactly one year from the date NAFT filed this case, it is not relevant to Mitsui's
motion.

[69]    *See* Def. Mem. at 4-5.

[70]    Arbitration Demand.

[71]    *See* Arbitration Claim ¶ 33 ("The Respondents have in their
possession NAFT's property (the CRUs) and have refused to return them to
NAFT.").

demand only demonstrates that NAFT sought relief in arbitration because Lionda had not returned NAFT's CRUs.

Mitsui only has established that NAFT's loss occurred at some point prior to July 26, 2004. Because Mitsui has failed to carry its burden of proving that the loss must have occurred prior to June 23, 2004, Mitsui's summary judgment motion based on time-bar is denied. Of course, the trier of fact may very well conclude based on a review of all the evidence that NAFT's claim is indeed time-barred.

### B.    Waiver and Estoppel

Depending on when the trier of fact determines NAFT's loss occurred, Mitsui may be estopped as a matter of law from asserting a limitations defense at trial. Although NAFT failed to preserve its rights under the Policy by entering into a standstill agreement or by filing an action prior to June 23, 2005, Mitsui misrepresented to NAFT the status of NAFT's claim on May 25, 2005, which lulled NAFT into delaying the filing of its suit. Therefore, if the trier of fact determines NAFT's loss occurred after May 25, 2004, Mitsui is estopped from asserting a limitations defense.

On May 25, 2005, in response to an inquiry from NAFT's broker regarding the status of its claim, Margolies stated that he "requested and [is]

-21-

presently awaiting Meaden & Moore's report, and will update [NAFT] hopefully next week."[72]  NAFT has shown that Margolies's statement was a misrepresentation of fact.  Not only had Margolies already received a draft report from Meaden & Moore dated April 29, 2005, but he forwarded that report to Mitsui's counsel so that Mitsui's counsel could render a coverage opinion regarding NAFT's claim.[73]  In addition, on May 24, 2005, one day prior to Margolies's statement to NAFT, Mitsui's counsel rendered its opinion to Margolies that Mitsui should deny coverage for NAFT's claim and proposed a draft declination letter that Mitsui could use for denying coverage.[74]  On May 26, one day after the inquiry from NAFT's broker, Margolies forwarded the May 24 letter from Mitsui's counsel, together with the proposed declination letter to his superior and requested the authority to deny NAFT's claim.[75]  In fact, Margolies knew on May 24 that he would request such authority because he testified that he "certainly would not have made a recommendation to [his superior] and senior

---

[72]     Margolies-Taylor E-mail.

[73]     *See* Meaden & Moore April 29 Report; Montbach Letter at 1; *see also* Margolies Aff. ¶ 5.

[74]     *See* Montbach Letter.

[75]     *See* Margolies-Lowden E-Mail.

management which was contrary to coverage counsel's legal opinion."[76] Therefore, Margolies's statement to NAFT on May 25, 2005 was misleading at best and very possibly false. At the very least, Margolies should have informed NAFT that although Mitsui had not yet reached a final decision, he was requesting authority to deny NAFT's claim and in all likelihood, Mitsui would deny NAFT's claim.

Mitsui argues that "the final Meaden & Moore report of May 25, 2005 was addressed to counsel and would not have been received by counsel until after May 25, 2005 and Mr. Margolies after that. As such Mr. Margolies' e-mail to NAFT's broker was entirely truthful."[77] Mitsui's argument is disingenuous. Not only was the Meaden & Moore April 29 Report addressed to Margolies, but on May 25, Margolies had already received the May 24 letter from Mitsui's counsel recommending that Mitsui deny coverage. It is unclear why Meaden & Moore did not send its final report to Mitsui's counsel until May 25, 2005, but it is also irrelevant to Mitsui's argument. NAFT has shown that Margolies's statement to NAFT's broker on May 25, 2005 regarding the status of NAFT's claim was misleading if not false. Thus, if the trier of fact determines that NAFT's loss

---

[76]     Margolies Aff. ¶ 4.

[77]     10/24/06 Letter from Montbach to the Court.

occurred after May 25, 2004, Mitsui is estopped as a matter of law from asserting a limitations defense at trial.[78]

## V.    CONCLUSION

For the foregoing reasons, Mitsui's motion for summary judgment is denied.  The Clerk of the Court is directed to close this motion [#37 on the Docket].  A conference is scheduled for November 22, 2006 at 4:30 p.m.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 7, 2006

---

[78]    The holding here differs from that reached in the first action brought by NAFT, No. 05 Civ. 4807, where, on the basis of different facts, I held that Mitsui was not estopped from asserting a limitations defense. *See North American Foreign Trading Corp.*, 413 F. Supp. 2d at 306.  In the first action, NAFT inquired into the status of its claim before Mitsui finished analyzing NAFT's claim and Mitsui truthfully informed NAFT that it would respond to NAFT when its analysis was complete. *See id.*  Here, Margolies lulled NAFT into delaying the filing of this litigation by misrepresenting to NAFT the status of NAFT's claim.

## - Appearances -

*For Plaintiff:*

Joseph F. Donley, Esq.
Rodney M. Zerbe, Esq.
Daniel A. Lebersfeld, Esq.
DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

John F. Ryan, Esq.
McDERMOTT & RADZIK, LLP
Wall Street Plaza
88 Pine Street, 21st Floor
New York, New York 10005
(212) 376-6400

*For Defendant:*

Francis A. Montbach, Esq.
Jacqueline K. Seidel, Esq.
MOUND, COTTON, WOLLAN & GREENGRASS
One Battery Park Plaza
New York, New York 10004
(212) 804-4200